## BACKGROUND AND QUALIFICATIONS

My background, experience, professional memberships and scholarly publications are summarized in my curriculum vitae. I am a licensed physician in the States of New York, New Jersey and Florida and I am board certified in psychiatry. I maintain a private practice office in psychiatry and psychoanalysis in New York City. As part of my practice, I have treated patients who have undergone sexual orientation change efforts (SOCE). Following my experience with those patients, I began to do research and write about the subject of SOCE beginning in the late 1990s.

I am a past president of the Group for Advancement of Psychiatry, a psychiatric think tank, a Distinguished Life Fellow of the American Psychiatric Association (APA), and I have served as a consultant to the American Psychiatric Association's Committee on Public Affairs as well as its Committee on Ethics. I am a past Chair of the Association's Committee on Gay, Lesbian, and Bisexual Issues and a Past President of the New York County Psychiatric Society, which, with almost 2,000 members, is the largest APA district branch in the United States.

I served on the American Psychiatric Association's DSM-5 Workgroup on Sexual and Gender Identity Disorders in its revision of the Fifth Edition of the

Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[1] I was also a

member of the World Health Organization's Working Group on the Classification

of Sexual Disorders and Sexual Health, which was part of the revision process of

the eleventh edition of the International Classification of Diseases (ICD-11).[2] Most

recently I served as Section Editor of the chapter on Gender Dysphoria in the

APA's Text Revision of the Diagnostic and Statistical Manual (DSM-5-TR).[3] I

have academic appointments at Columbia University College of Physicians and

Surgeons (Clinical Professor of Psychiatry) and at New York University (Adjunct

Professor, Postdoctoral Program in Psychotherapy and Psychoanalysis). I am a

Training and Supervising Analyst at the William Alanson White Institute of

Psychiatry, Psychoanalysis and Psychology.

I have authored and co-authored numerous professional articles and book

chapters dealing with sexual orientation issues, including a book, Psychoanalytic

Therapy and the Gay Man, and chapters on "Homosexuality, Gay and Lesbian

---

[1] American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders, 5th edition (DSM-5).* Washington, DC: American Psychiatric Press.

[2] World Health Organization (2019/2021). *International Statistical Classification of Diseases and Related Health Problems, 11th Revision (ICD-11).* Geneva, Author, https://icd.who.int/browse11.

[3] American Psychiatric Association (2022). *Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision (DSM-5-TR).* Washington, DC: American Psychiatric Press.

Identities, and Homosexual Behavior" from the 8th through the 11th editions of Kaplan and Sadock's Comprehensive Textbook of Psychiatry—one of the most widely used psychiatric textbooks in the world. I am also the senior author in the chapter entitled "Gender Identity, Gender Variance, Gender Dysphoria/Incongruence" in the 10th and 11th editions of the Kaplan and Sadock Textbook. I have edited two professional books addressing SOCE.[4][5] I was First Author of "The Growing Regulation of Conversion Therapy,"[6] in the Journal of Medical Regulation, the official journal of the Federation of State Medical Boards, which received an Award for Excellence in Editorial Writing. I have also edited and co-edited numerous books dealing with gender, sexuality and the health and mental health of the LGBTQ communities. I often speak for the APA to the media and general public on LGBTQ issues including sexual orientation change efforts (SOCE).

---

[4] Shidlo, A., Schroeder, M. & Drescher, J., eds. (2001). *Sexual Conversion Therapy: Ethical, Clinical and Research Perspectives.* New York: CRC Press.
[5] Drescher, J. & Zucker, K.J., eds. (2006). *Ex-Gay Research: Analyzing the Spitzer Study and Its Relation to Science, Religion, Politics, and Culture.* New York: Routledge.
[6] Drescher, J., Schwartz, A., Casoy, F., McIntosh, C.A., Hurley, B., Ashley, K. et al. (2016). The Growing Regulation of Conversion Therapy. *J Medical Regulation,* 102(2):7-12.

I served as one of six members on the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation. The Task Force issued a report of its findings in 2009, after a lengthy process of extensive study of the existing research and drafting and peer review of the findings.[7]

## SEXUAL ORIENTATION

Since at least the middle of the 19th century, scientists had debated the issue of whether homosexuality was an illness or a normal variant of human sexuality. During the social turmoil of the 1960's and 1970's, protests prompted organized psychiatry to scientifically reassess the pathologizing of homosexuality. As a result, in 1973, the American Psychiatric Association (APA) removed homosexuality from the list of mental disorders in the Diagnostic and Statistical Manual of Mental Disorders (DSM). The DSM-II instead included the term "sexual orientation disturbance," which was replaced in the DSM-III by "egodystonic homosexuality". In 1987, ego-dystonic homosexuality was removed entirely from the DSM-III-R, as it was recognized that the term still pathologized homosexuality, and such a result was inconsistent with the evidence-based

---

[7] American Psychological Association, Task Force on the Appropriate Therapeutic Response to Sexual Orientation. (2009). *Report of the Task Force on the Appropriate Therapeutic Response to Sexual Orientation*. Washington, DC: Author.

approach embraced by psychiatry. The World Health Organization later followed suit, removing homosexuality from the Tenth Edition of the International Classification of Diseases (ICD-10) in 1992.[8][9][10]

Once homosexuality was no longer considered a mental disorder or disease, the debate over treatment of homosexuals continued. Two sides with differing belief systems emerged: on one side is the mental health mainstream which believes that homosexuality is normal and acceptable while the other side believes that homosexuality is neither normal nor acceptable.

The first belief system – the "normal/identity model" regards homosexuality as a normal variation of human expression and the acceptance of one's homosexual orientation as a distinguishing feature of a gay or lesbian identity. This position regards gay men and lesbians as sexual minorities who need protection from

---

[8] Drescher, J. (2010). Queer diagnoses: Parallels and contrasts in the history of homosexuality, gender variance, and the *Diagnostic and Statistical Manual* (DSM). *Archives of Sexual Behavior,* 39:427–460.

[9] Drescher, J. (2015). Queer diagnoses revisited: the past and future of homosexuality and gender diagnoses in DSM and ICD. *International Review of Psychiatry,* 27(5):386-395.

[10] Drescher, J. (2015). Out of DSM: Depathologizing homosexuality. *Behavioral Sciences,* 5:565-575.

discriminatory practices, including changing laws based on characterizations of homosexuality as either an illness or immoral choice.

The opposing position operates from an "illness/behavior model". This model regards any open expressions of homosexuality as behavioral symptoms either indicative of psychiatric illness or a moral failing, or perhaps some combination of both. This position maintains that illness and/or immorality cannot provide a foundation for creating a normal identity.

Following the 1973 removal of homosexuality from the DSM, professional organizations like the American Psychiatric Association, the American Medical Association and the American Psychological Association, among others, recognized and accepted some of the social implications of the normal/identity model. Position statements were published supporting nondiscrimination on the basis of sexual orientation. The recognition and acceptance of the normal/identity model led some opposed to the model to claim that professional organizations had been "taken over" by "homosexual activists" and to dismiss their moral or scientific authority in the sociopolitical debate.[11]

---

[11] Drescher, J. (2002). Ethical issues in treating gay and lesbian patients. *Psychiatric Clinics North America,* 25(3):605-621: at 607, citing Socarides, C.W.

Other clinicians, whose belief in the discredited illness/behavior model put them at odds with the mental health mainstream, began speaking out to the general public instead. Their message was that heterosexuality is the only normal expression of human sexuality, homosexuality is a sick/immoral "behavior" and not a "normal identity" and gay people are only seeking approval for bad behavior.[12] These therapists oppose the normal/identity model and argue that people are not "born gay" and can change their sexual orientation.[13]

RISK OF HARM FROM SOCE

Sexual orientation conversion efforts, even conducted through talk therapy, can cause significant harm to patients. This is due, in part, because SOCE have as their underpinning verbal misrepresentations about human sexual development. Typical statements in "treatment" by SOCE practitioners include hurtful untruths, such as "you have a mental disorder, no matter what the American Psychiatric Association says" or "if you are gay, you will probably die early and live an unhappy and unhealthy life." Or "gay relationships do not last and you will grow

---

(1995). *Homosexuality: A Freedom Too Far.* Phoenix, AZ: Adam Margrave Books.
[12] Id. at 607-08.
[13] Id. at 608.

up to be old and lonely." Or "God will not love you if you are gay."[14] The discredited theories used to explain same-sex attraction include male patients not having close enough relationships with their father figures, or having dominating mother figures, or having been sexually abused early in their lives.[15] In fact, there are many theories but in fact, the "causes" of homosexuality or heterosexuality are unknown.

Reparative therapists' beliefs can create unreasonable expectations since an underlying premise of SOCE is that "if you want to change and try hard enough, or if your faith is strong enough, you can." This concept sets patients up to blame themselves for the treatment's failure, even though the majority of people who attempt SOCE fail to change. When the change efforts are unsuccessful, the patient is told and often believes it is the patient's own lack of motivation or faith, rather than any fault of the practitioner or the therapy itself, that led to failure to change. Such self-blame is always harmful to the patient.

---

[14] Schroeder, M. & Shidlo, A. (2001). Ethical issues in sexual orientation conversion therapies: An empirical study of consumers. *J. Gay & Lesbian Psychotherapy,* 5(3/4):131:166. Reprinted in: *Sexual Conversion Therapy: Ethical, Clinical and Research Perspectives,* eds. A. Shidlo, M. Schroeder & J. Drescher. New York: CRC Press, 2001, pp. 131-166.
[15] Nicolosi, J. (1991). *Reparative Therapy of Male Homosexuality: A New Clinical Approach.* Northvale, NJ: Aronson.

Additional adverse effects of SOCE have been reported in any number of autobiographical accounts by gay individuals who unsuccessfully attempted to change their sexual orientations. Some reported therapist encouragement to marry and have children, followed by the eventual dissolution of a patient's heterosexual marriage. Others have reported feelings of depression, suicide, anxiety, and guilt evoked in a patient when the treatment failed. Still others have reported loss of self-esteem, avoidance of intimacy and sexual dysfunction.

Even though there is literature concerning the adverse effects of SOCE in adult patients, there is little study of SOCE in minors. The few non-peer reviewed presentations on childhood SOCE interventions are based on theories of sexual orientation that assume certain patterns of family relationships cause same-sex sexual orientation, and that encouraging gender stereotypical behavior and family relationships will alter sexual orientation.

Despite the lack of scientific studies, minors are particularly at risk of harm from SOCE due to their emotional and cognitive vulnerability. They have limited capacity to participate in decision-making regarding their own treatment, and don't have the legal capacity for informed consent. They may be unable to anticipate the future consequences of a particular course of action or therapy. Minors depend on

their parents to make treatment decisions for them, and their financial and psychological dependence on their parents may also eliminate any choice whether to undergo SOCE.

Unlike proven medical treatments, SOCE is not proven effective, and may, in fact, be harmful. The therapist is an authority figure to the child, so statements that have negative impact on adults may have an even greater impact on children. Children may be particularly vulnerable to statements that "God will not love them" if they are gay, or, even worse, they are made vulnerable by the fear of family rejection in the likely event the therapy does not succeed. At least one study of lesbian, gay and bisexual youth has shown that family rejection is strongly associated with poor mental health outcomes as these groups were found to be 8.4 times more likely to report having attempted suicide, 5.9 times more likely to report high levels of depression and 3.4 times more likely to use illegal drugs.[16] LGBT youth are overrepresented in foster care, juvenile detention, and among homeless youth, often because parents who cannot accept children who are gay or gender variant throw them out of the home.

---

[16] Ryan, C., Huebner, D., Diaz, R.M. & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in white and Latino lesbian, gay, and bisexual young adults. *Pediatrics,* 123(1):346-352.

In SOCE approaches, simplistic misrepresentations of complex issues are often presented to clients, their families and the public as facts, which results in unrealistic expectation and self-blame. In SOCE approaches with minors, an unscientific opinion based on an unproven theory may be elevated to the same level as science because of the child's perception of the therapist as an authority figure who represents the wishes of parents. In such cases, not only is a minor patient unable to give informed consent, parental consent is often based primarily upon their desires to change their child's sexual orientation rather than on sorting out the science and pseudoscience of human sexuality. Some parents are willing to make major sacrifices of time, effort, and money to achieve that goal, regardless of any proven lack of efficacy.

Patients may feel abandoned and may sometimes be abandoned by their therapists in the event they determine that SOCE is unsuccessful and they choose to come out as gay, lesbian or bisexual. In reviewing the literature, there is little evidence that SOCE practitioners would refer a patient to another therapist who could provide a different type of therapy. Without a referral, and in need of continued therapy, according to anecdotal reports the patient may feel abandoned, with an increase in depression, anxiety and self-blame.

SOCE practitioners and their supporters, after more than half a century of practice, have failed to demonstrate the efficacy of SOCE or to refute the reports of harm reported by individuals and therapists. When there is a risk of harm and no proven efficacy of treatment, the maxim "first do no harm" must come into play when treating patients, particularly minors.

## GENDER IDENTITY

Psychiatric and medical theorizing about transsexualism and transgender presentations also began in the 19th century. Until the middle of the 20th century, with rare exceptions, transgender presentations were usually classified as "psychopathological." Complicating matters further, the early medical and scientific literature in this area classified these individuals as "homosexuals." It was not until the middle of the 20th century, that science and medicine delineated the distinctions between a "sexual orientation"—defined as the sex or sexes to which one is attracted—from a "gender identity"—the sex with which one identifies.[17] In time, what was once considered an exceedingly rare condition gradually became more publicly visible and in recent years an increasing number of people have publicly identified themselves as "transgender" or as having some

---

[17] Drescher, J. (2013). Gender identity diagnoses: History and controversies. In: *Gender Dysphoria and Disorders of Sex Development,* Eds. B.P.C. Kreukels, T.D. Steensma & A.L.C. de Vries. New York: Springer, pp. 137-150.

alternative gender identity. In addition, a number of nations, provinces and
municipalities have enacted laws establishing "gender identity" as a protected
group along the line of categories like race, ethnicity, age, sex, and sexual
orientation.

Historically, as in the case of homosexuality, when transgender identities
became more widely known to science, medicine and psychiatry, they too found
their way into diagnostic manuals. Although the World Health Organization's
International Classification of Disease (ICD) has been listing mental disorders
since ICD-6 in 1948, there was no reference to any gender diagnoses such as
"transsexualism" or "gender identity disorder." Nor did these diagnoses appear in
ICD-7 (1955) or ICD-8 (1965). It is only in ICD-9 (1975) that a diagnosis of
"trans-sexualism" first appeared in the manual's mental disorders section. The
diagnosis reappeared as "transsexualism" in ICD-10 (1990/1992) where an
additional diagnosis was added for prepubescent children: "gender identity
disorder of childhood." However, in its most recent iteration, ICD-11 (2019/2021),
the diagnoses have been renamed "gender incongruence of adolescence and
adulthood" and "gender incongruence of childhood."[18] In addition, both diagnoses

---

[18] Reed, G.M., Drescher, J., Krueger, R.B., Atalla, E., Cochran, S.D., First M.B.,
Cohen-Kettenis, P.T., et al. (2016). Revising the ICD-10 Mental and Behavioural
Disorders classification of sexuality and gender identity based on current scientific

are no longer in ICD's "mental disorders" section but instead in a new chapter entitled "conditions related to sexual health." These changes effectively reduce some of the stigma associated with a mental disorder diagnosis, similar to the way APA's removal of "homosexuality per se" from the DSM reduced stigmatization of gay, lesbian and bisexual people.

During the DSM-5 revision process (2008-2013), there were calls for APA to remove the diagnosis of "gender identity disorder" from the manual altogether, as homosexuality had been removed in 1973. However, APA chose to retain a DSM diagnosis, renamed "gender dysphoria" in DSM-5 and DSM-5-TR in order to allow individuals in need of treatment to have a diagnosis that would allow them to access needed care. The United States has not yet adopted WHO's ICD-11 which removed the diagnosis of "gender incongruence" from the mental disorders section. In fact, the US only started using ICD-10 in 2015 even though that revision was finalized in 1992. It is unclear when the US will adopt the use of ICD-11.

RISK OF HARM FROM GICE

evidence, best clinical practices, and human rights considerations. *World Psychiatry,* 15:205–221.

The subject of gender identity conversion efforts has not been as well studied as SOCE. However, the literature on GICE, although it was not referred to as such at the time, dates back to the 1970s[19] with the first published accounts of prepubescent children who presented with what was then called "gender identity of children" but would today be referred to as "gender dysphoria" (DSM-5-TR) or "gender incongruence" (ICD-11). The earliest practitioners who identified and treated these children in specialized gender clinics tried to reduce the dysphoria and make the children more comfortable with what today in the literature is referred to as their "birth-assigned sex."[20][21]

By the 1990s, ongoing research in this area in the Netherlands led to the development of a more neutral, "wait and see" model towards how a child's final gender identity unfolded since it was unclear that earlier approaches worked at changing a gender identity and may even have harmed gender dysphoric children

---

[19] Green, R. (1976). One hundred ten feminine and masculine boys: Behavioral contrasts and demographic similarities. Archives of Sexual Behavior, 5(5):425-446.

[20] Green, R. (1987). *The "Sissy Boy Syndrome" and the Development of Homosexuality.* New Haven, CT: Yale University Press.

[21] Zucker, K.J. & Bradley, S. (1995). *Gender Identity Disorder and Psychosexual Problems in Children and Adolescents.* New York: Guilford Press.

by shaming them for their atypical gender interests.[22] A more permissive and accepting, "gender affirmative" model later developed in the US which presumed that children of any age who claimed alternative genders should be taken at their word and allowed to socially transition before puberty.[23] I co-edited a book on these varied approaches to treatment which was published in 2013.[24]

One of the earliest accounts of harm caused by GICE appeared in the doctoral dissertation of a former patient who was treated in one of the earliest studies.[25] Harms caused by GICE have been delineated more extensively in recent studies. These studies report that individuals who have undergone GICE may experience, depression, panic disorder and suicidal ideation and attempts.[26]

---

[22] de Vries, A.L. & Cohen-Kettenis, P.T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch approach. *J Homosexuality,* 59(3):301-20.

[23] Ehrensaft, D. (2012). From gender identity disorder to gender identity creativity: True gender self child therapy. *J Homosexuality,* 59(3):337-356.

[24] Drescher, J. & Byne, W., eds. (2013). *Treating Transgender Children and Adolescents: An Interdisciplinary Discussion.* New York: Routledge.

[25] Bryant, K.E. (2007). *The Politics of Pathology and the Making of Gender Identity Disorder.* Unpublished doctoral dissertation, U California, Santa Barbara.

[26] Lee, H., Operario, D., Restar, A. J., Choo, S., Kim, R., Eom, Y.-J., Yi, H., & Kim, S.-S. (2022). Gender identity change efforts are associated with depression, panic disorder, and suicide attempts in South Korean transgender adults. *Transgender Health,* 8(3), 273-281.

SOME (BUT NOT ALL) OPINIONS ABOUT PLAINTIFF'S COMPLAINT

AND DECLARATIONS

Plaintiff declares "counseling is a form of speech protected by the First Amendment" (Complaint, No. 21). However, courts in California[27] and New Jersey[28] have disagreed with this argument made in similar cases, recognizing the right of the state to weigh in and regulate appropriate forms of medical treatment.

The plaintiff declares that the ordinance "forces her to choose between her faith and government penalty" (Complaint, No. 35). However, if her professions' standards are at odds with her religious beliefs, she can always refer a patient who generates such a conflict for her to a competent colleague who does not have the same conflict. This is a standard ethical practice.

The plaintiff declares that "Every individual I counsel is different and their needs are fact-specific" (Declaration 1, No. 13). However, contrary to what she believes, there exist minors whose gender dysphoria resolves with gender transition.[29] Yet earlier in her declaration (No. 11), the plaintiff states she practices

---

[27] Pickup v Brown
[28] King v Christie
[29] Drescher, J. (2023). Evolving controversies in the treatment of gender dysphoric/gender incongruent minors. Psychiatric News, 58(6):25-28. Accessed

psychotherapy from the position that "it is not in a minor's best interest to

'transition' from one gender identity to another." She denies the possibility that

minors who might benefit from a gender transition do exist. It is likely that the

plaintiff may not know the difference between such clinical presentations and that

she may even inadvertently harm a minor who would benefit from a gender

transition. This is an issue of clinical competency, not freedom of religion.

The plaintiff states, "It is my religious belief that God creates humans as

either male or female; that one's sex or gender is not changeable; and that healthy

sexual behavior occurs between one male and one female in the context of

marriage" (Declaration 1, No. 15). While the plaintiff is entitled to her religious

beliefs, there is little in my reading of today's scientific and medical literature that

supports her religious positions on homosexuality and gender identity.

The plaintiff states, "The application of the Ordinance is unclear in many

circumstances. For example, I do not know what counseling is permitted when a

minor is unsure about whether to transition or when a minor wishes to

'detransition.' I do not know what the Ordinance considers to be an 'unsafe sexual

---

July 10, 2023 online at
https://psychnews.psychiatryonline.org/doi/10.1176/appi.pn.2023.06.6.27

practice[ ]' as opposed to a safe sexual 'behavior' which I may not attempt to change" (Declaration 1, No. 17). However, if a therapist does not understand the contemporary language of clinical treatment, it is usually recommended that the therapist educate themself on the subject. Rather than declaring her ignorance to the court, the plaintiff might instead seek supervision from a clinician who can explain the things to her that she claims not to understand so that she might better help all her clients.  This is especially so here, where the mandate and scope of the City's ordinance is quite clear to any professional familiar with the position statements of the relevant professional organizations.

The plaintiff declares, "In the past, when counseling minors who have requested my help on issues of sexuality and sexual orientation, I have provided counseling, within the framework of the counselor-patient partnership, in which the goal of the counseling is to help the patient change their behaviors and to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex" (Declaration 2, No. 2). This declaration indicates the plaintiff unapologetically practices conversion therapy of homosexuality or SOCE.

The plaintiff declares, "In the past, when counseling minors who have requested my help on issues of gender identity, I have provided counseling, within

the framework of the counselor-patient partnership, in which the goal of the counseling is to help the patient eliminate or reduce feelings of being the opposite sex or a desire to identify as the opposite sex" (Declaration 2, No. 3). This declaration indicates the plaintiff unapologetically practices conversion therapy of gender identity or GICE.

CONCLUSION

As noted by the American Psychological Association's 2009 report, any "benefits reported by participants in SOCE may be achieved through treatment approaches that do not attempt to change sexual orientation."[30] Thus the position of mainstream medical and mental health professions is that the role of a therapist is to help patients tolerate the feelings that emerge during the process of exploring possible sexual and gender identities. Rather than focusing on a single outcome, a therapist should regard a patient arriving at either a homosexual or heterosexual identity, or a gender variant or cisgender (non-transgender) identity, as a reasonable outcome of treatment. The therapist's dedication to the patient's best interest should be paramount in any treatment. SOCE and GICE are contrary to

---

[30] American Psychological Association, Task Force on the Appropriate Therapeutic Response to Sexual Orientation. (2009). *Report of the Task Force on the Appropriate Therapeutic Response to Sexual Orientation*. Washington, DC: Author, p. 68.

this recognized objective of treatment, and, as repeatedly recognized in the mainstream medical and mental health community, SOCE and GICE provide little benefit to patients while exposing those patients to unnecessary risks of harm. Accordingly, a local ordinance like the City's here, based upon these empirical assessments of mainstream medical and mental health professionals, is one of the very few, if not the only, responses a municipality can pursue, given that the municipality is not charged with either training or regulation of the profession, as the state is, but is forced to consider the issue of conversion therapy within its jurisdiction.